**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

CATALINA WORTHING INSURANCE, LTD. *formerly known as* THE EXCESS INSURANCE COMPANY LTD.,

Plaintiff,

-against-

NEM-RE RECEIVABLES, LLC,

Defendant.

-------------------------------------------------------------X

**ORDER**

**24-CV-4566 (JW)**

**JENNIFER E. WILLIS, United States Magistrate Judge:**

On June 14, 2024, Plaintiff Catalina Worthing Insurance, Ltd., formerly known as The Excess Insurance Company Limited ("Plaintiff" or "Catalina"), commenced this action by filing a petition to stay arbitration demanded by NEM-RE Receivables, LLC ("Defendant" or "NEM Re") and seeking a declaratory judgment that (1) the applicable statute of limitations bars NEM Re's claims and prevents the claims entirely, or alternatively (2) NEM Re is not entitled to pursue its claims under the arbitration provisions of the reinsurance agreements because it was not a party to those agreements. Dkt. No. 1.

On December 18, 2025, Catalina moved for summary judgment seeking a declaratory judgment that the statute of limitations bars NEM Re from pursuing any claims against Catalina. Dkt. No. 51. On January 22, 2026, NEM Re opposed the motion. Dkt. No. 52. On May 6, 2026, this Court heard oral argument on the motion for summary judgment. On May 22, 2026, Catalina filed a notice of supplemental authority, which NEM Re responded to on May 26, 2026. Dkt. Nos. 60-61. For the

following reasons, Catalina's motion for summary judgment is **GRANTED** and a declaratory judgment in favor of Catalina is entered.

## BACKGROUND

The following facts are drawn from the Parties' submissions in connection with the Motions and are not materially in dispute unless otherwise noted.

### A. Federated Re's Liquidation

In 1990 Federated Reinsurance Company ("Federated Re"),[1] became insolvent and was placed into liquidation under the supervision of the Commissioner of the Insurance of the State of New York (the "Liquidator"). Dkt. No. 52-1 at ¶ 1.

Catalina, then known as The Excess Insurance Company Limited,[2] is a reinsurance company. Id. at ¶ 3. At the time of Federated Re's liquidation, Catalina was one of the reinsurers that participated in excess of loss reinsurance treaties with Federated Re. Id. at ¶¶ 2-3. One such Treaty was the Excess Casualty Reinsurance Association ("ECRA") pool, which was administered by the Excess and Treaty Management Corporation ("ETMC"). Dkt. No. 52-2 at ¶¶ 2-3 (Affidavit of Joseph Scognamiglio).

During the liquidation process, Catalina was among the reinsurance companies billed by the Liquidator. Dkt. No. 52-1 at ¶ 3. The reinsurance billings

[1] After Federated Re entered liquidation, its name was changed to NEM Re Insurance Corporation. Dkt. No. 52-1 at ¶ 1. For the purpose of this Order, the Court will refer to it as Federated Re only.
[2] For the purpose of this Order, the Court will refer to Plaintiff as Catalina, not The Excess Insurance Company Limited.

were due to asbestos-related liabilities paid by Federated Re before insolvency.[3] Id. at ¶ 5. The Liquidator billed Catalina under a single loss occurrence for the asbestos-related losses irrespective of the number of policyholders and claimants involved. Id.

**B. Catalina's Response to the Liquidator's Reinsurance Billings**

Catalina, together with other reinsurers, appointed Mendes & Mount LLP ("Mendes & Mount") to investigate and respond to the Liquidator's reinsurance billings. Id. at ¶ 6. On October 11, 2001, Mendes & Mount sent a letter to the Liquidator denying the billings:

> As we previously advised, based upon the aforementioned issues which we previously detailed in our letters of June 24, 1999 & August 3, 2000, we continue to deny the validity of the reinsurance claim submitted with respect to the captioned matters.[4]

Id. at ¶ 8; Dkt. No. 51-9 at 2. The two bases for which Catalina denied the reinsurance billings were (1) the Liquidator failed to substantiate the exact amounts paid in connection with each loss, and (2) the Liquidator failed to substantiate the basis upon which the Liquidator submitted all asbestos related losses as a single insurance loss. Id. at 1-2.

**C. The Allowance**

As part of the liquidation process, all creditors were required to file proof of claim by September 15, 1999. Dkt. No. 52-1 at ¶ 10. Catalina submitted a proof of

[3] Defendant asserts that the billings "must also include amounts notified to the liquidator during the liquidation, not only those paid before its insolvency," but does not cite to anywhere in the record to support the assertion.

[4] Defendant denies that the October 2001 letter is a formal rejection of the billings. Dkt. No. 52-1 (Response to ¶ 8).

claim against Federated Re's estate for amounts that Federated Re owed to Catalina by the required date. Id. After the submission, the Liquidator initially calculated the Allowance at zero, determining that Catalina was a debtor to Federated Re. Id. at Response to ¶ 10. However, Catalina objected to the ECRA claims the Liquidator processed and as a result of negotiation, the amount was adjusted by $361,752.63 to a net claim Allowance of $169,919.00. Id. at ¶ 10; Dkt. No. 51-11. Per the settlement, the Liquidator omitted the ECRA reinsurance billings from the Allowance and did not require Catalina to pay them. Dkt. No. 52-1 at ¶ 11.[5]

On June 11, 2003, the Liquidator accepted the Allowance without court approval in violation of New York Insurance Code, which requires that disposition of assets over $25,000 be court approved. Id. at ¶ 10 n. 2.

**D. The Assignment Agreement**

On January 26, 2004, NEM Re entered into an Assignment agreement with the Liquidator to purchase the remaining reinsurance recoverables ("Recoverables") due to Federated Re. Id. at ¶ 13; Dkt. No. 51-8. The Recoverables were defined as "the remaining reinsurance recoverables due to [Federated Re] which have not been collected as of August 1, 2003." Id. The Assignment granted NEM Re:

> (a) all right, title, interest in and to the Recoverables (b) any and all right and claims against any person in connection with any event giving rise to the Recoverables, and (c) all cash or non-cash proceeds collected in respect of the Recoverables by [Federated Re] or the Liquidator of [Federated Re] since August 1, 2003.

[5] NEM Re does not deny that the Liquidator omitted the reinsurance billings from the Allowance but asserts that the reason the Liquidator omitted the billings was to close the estate. Dkt. No. 52-1 at Response to ¶ 11.

Id. at Section B.

Before the Assignment, NEM Re had access to Federated Re's liquidation files. Dkt. No. 52-1 at ¶ 14. NEM Re "only reviewed a tiny percentage of the books and records," and was not aware of Catalina's claim. Dkt. No. 51-29 at 21:11-16; 41:1-6. However, the Liquidator made all of the books and records available to them, including Catalina's claim. Id.[6]

**E. The Destruction and Reconstruction of Records**

In 1999, the ECRA pool records were transferred to Guy Carpenter & Company, Inc. ("Guy Carpenter"). Dkt. No. 52-2 at ¶ 4. On September 11, 2001, Guy Carpenter's offices, located in the World Trade Center, were destroyed. Id. at ¶ 5. As a result, the accounting records, asbestos-related claim files, and related source documentation for the ECRA pool were destroyed. Id.

Because of the destruction of records that occurred prior to NEM Re's Assignment, NEM Re had to reconstruct lost data. Dkt. No. 52-2 at ¶ 24. In March 2010, NEM Re received reconstructed loss data that was sufficiently complete to present claims to reinsurers. Id. at ¶ 28. NEM Re presented its claims to Guy Carpenter in 2010, who advised that they would not process the claims presented. Id. at ¶¶ 31-32.

[6] NEM Re does not deny that it did not review the vast majority of files but provides the explanation that the Liquidator only allowed four hours for review and asserts it would have reviewed all of the relevant records had the Liquidator permitted. Dkt. No. 53-1 at Response to ¶ 14.

**F. The 2008-2009 Contact**

In 2008, NEM Re contacted Catalina about the ECRA claims. Catalina informed NEM Re that Catalina was a creditor of Federated Re and that they had reached a settlement during the Liquidation, which was confidential. Dkt. No. 52-2 at ¶ 20.

In 2009, NEM Re contacted representatives of the ECRA pool. Dkt. No. 52-1 at ¶ 17. NEM Re inquired about information and evidence supporting the asbestos related losses that Catalina requested from the Liquidator in the 1990s. Id. NEM Re received records related to the Liquidators reinsurance billings in 2010. Id.

**G. The 2023 Demand**

In 2023, Joseph Scognamiglio ("Scognamiglio"), the Managing Member of NEM Re, realized that the prior settlement between Catalina and the Liquidator that involved the ECRA claims was not court approved. Dkt. No. 52-2 at ¶ 20. On September 25, 2023, NEM Re contacted Catalina stating that the asbestos claims, which were omitted from the Federated Re Liquidation, remain unpaid and are collectible. Dkt. No. 52-1 at ¶ 18; Dkt. No. 51-6. NEM Re informed Catalina that the reinsurance billings were due at the time the Liquidator recommended the Allowance to Catalina in June 2003. Dkt. No. 52-1 at ¶¶ 18-19. Though the billing amount was §336,081.16 at the time of the Liquidation, NEM Re calculated the amount owed by Catalina at $403,748.42 in the 2023 demand based on the fact that the ECRA pool liabilities continue to develop. Id. at Response to ¶ 19; Dkt. No. 52-2 at ¶ 39.

NEM Re emailed Catalina again in October 2023, December 2023, and January 2024 but received no response. Dkt. No. 51-6. In NEM Re's final email to Catlina in January 2024, NEM Re informed Catalina that if no response was received, it would submit a demand for arbitration by the end of the month. Id.

NEM Re's demand sought payment from Catalina for the following amounts:

| Treaty Year | Broker Reference No. | Reinsurer Reference Number | Amount NEM RE Claims is Due |
|---|---|---|---|
| 1/1/1974 | UJX0548 | K74T7414157 | $40,000.50 |
| 1/1/1975 | UKX0548 | K75T7514157 | $50,000.40 |
| 1/1/1975 | UKX0768 | K75T7515488 | $9,999.90 |
| 1/1/1976 | ULX0548 | K76T7614157 | $57,494.25 |
| 1/1/1976 | ULX0768 | K76T7615488 | $13,486.50 |
| 1/1/1977 | UMX0548 | K77T7714157 | $54,731.25 |
| 1/1/1977 | UMX0768 | K77T7715488 | $14,809.50 |
| 1/1/1978 | UNX0548 | K780141565 | $62,133.75 |
| 1/1/1978 | UNX1168 | K780154881 | $30,262.50 |
| 1/1/1979 | UPX0548 | K790141565 | $61,845.00 |
| 1/1/1979 | UPX1168 | Unavailable | $12,239.25 |
| 1/1/1980 | UQX0548 | K800141565 | $43,002.00 |
| 1/1/1981 | URX0548 | K810141565 | $13,826.03 |
| | | **Total** | $403,748.42 (after credits) |

Dkt. No. 51-2 at ¶21. All of the Booker Reference Nos. that NEM Re sought payment for in 2023 were reinsurance billings for which Catalina appointed Mendes & Mount to investigate and contest in 1996. Dkt. No. 51-12.

## PROCEDURAL HISTORY

On June 14, 2004, Catalina filed a petition to stay arbitration and a claim for a declaratory judgment against NEM Re. Dkt. No. 1. On July 24, 2024, NEM Re filed its opposition to Catalina's petition to stay arbitration. Dkt. No. 7. On December 12, 2024, Judge Caproni granted Catalina's petition to stay arbitration and denied the request for a declaratory judgment without prejudice. Dkt. No. 14. The Court, in granting Catalina's motion to stay arbitration, stated that NEM Re failed to demonstrate by a preponderance of the evidence that an agreement to arbitrate existed between the Parties based on the Assignment.[7] Id. at 8. In denying Catalina's motion for declaratory relief the Court stated:

> The Court cannot resolve on this very limited record whether all of the claims NEM RE now makes had ripened into billings at the time of Federated Re's liquidation; if they had, those claims would seem to now be bared by the statute of limitations, as well more than six years have passed since NEM RE was assigned the right to collect Recoverables and thus possessed a legal right to demand payment.

Id. at 9. Based on the record before the Court, Catalina was not entitled to declaratory relief without further discovery to resolve outstanding factual disputes, including when the statute of limitations began to run on each claim. Id.

---

[7] At the time of the Court's Order, neither Party had provided the Court with the Assignment agreement. Id. at 3.

On October 31, 2025, the Parties consented to this Court's jurisdiction. Dkt. No. 47. On December 18, 2025, Catalina filed a Motion for Summary Judgment. Dkt. No. 51. NEM Re filed its Opposition on January 22, 2026. Dkt. No. 52. Catalina filed its Reply to NEM Re's Opposition on January 30, 2026. Dkt. No. 53. Oral argument on Catalina's Motion for Summary Judgment was held on May 6, 2026. On May 22, 2026, Catalina filed a notice of supplemental authority, which NEM Re responded to on May 26, 2026. Dkt. Nos. 60-61.

## LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment..." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of

materials in the record" to survive a motion for summary judgment. Fed. R. Civ. P. 56(c)(1)(A); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (quoting Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).

## DISCUSSION

The only question before the Court is whether Catalina is entitled to summary judgment on Count Three of the Complaint, which seeks a declaratory judgment that NEM Re's demand for payment is barred by the statute of limitations. However, as a threshold matter, the Court will address Catalina's argument that NEM Re should be collaterally estopped from litigating the statute of limitations issue because the Court in Fortress Re already decided the same issue.

### A. Collateral Estoppel Based on Fortress Re

The doctrine of collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party…whether or not the tribunals or causes of action are the same." Ryan v. New York Tel. Co., 62 N.Y.2d 494, 500 (1984) (internal citation omitted). The parties in the two proceedings need not be the same. Pack v. Artuz, No. 99 Civ. 4604 (VM), 348 F.Supp.2d 63, 70 (S.D.N.Y. 2004). Under New York law, collateral estoppel applies "if the issue in the second action is identical to an issue which was raised, necessarily decided, and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." McGuinn v. Smith, 523 Fed.Appx. 764, 765-66 (2d Cir. 2013) (citing City of New York v. Welsbach Elec. Corp., 9 N.Y.3d 124 (2007). The party invoking the doctrine of collateral estoppel bears the burden of showing the issue was raised and necessarily decided in the prior proceeding. Id. at 766.

#### 1. The Fortress Re Case

Catalina's position is that the question of whether the statute of limitations bars NEM Re's demand in this case has already been decided by the Fortress Re case. NEM Re Receivables, LLC v. Fortress Re, No. 15 Civ. 3875 (VM), 173 F.Supp.3d 1 (S.D.N.Y. Mar. 24, 2016). As a result, Catalina argues that NEM Re should be precluded from relitigating the issue. Mot. for S.J. at 11-12.

In Fortress Re, NEM Re brought a claim of accounting against Fortress for the funds held by Fortress on behalf of Federated Re. Fortress Re, 173 F.Supp.3d at 2.

Fortress was an agent and manager for insurance companies, including Federated Re. Id. at 3. When Federated Re became insolvent, the Fortress Re pool stopped accepting new business on behalf of Federated Re but claims and cash flow from previous business continued to develop. Id. In 2004, the Liquidator "assigned all of Federated's then-uncollected accounts receivable to NEM Re."[8] Id. After the assignment, there were several communications between NEM Re and Fortress about funds Fortress was holding from previously written reinsurance business that NEM Re repeatedly demanded. Id. at 3-4. Despite the dispute between NEM Re and Fortress, NEM Re did not file the action seeking the funds until 2015. Id. at 4.

Though the action brought was for accounting, the court in Fortress Re found NEM Re "failed to meet the requirements for a claim of accounting," and analyzed the claim as "actually an action for breach of contract." Id. at 8. Applying the six-year statute of limitations, the court found that because "NEM Re had the legal right to demand payment when the Commissioner assigned all of Federated Re's uncollected accounts receivable to NEM Re in 2004," the statute of limitations expired in 2010. Id. at 9. Though NEM Re argued a 2009 communication tolled the statute of limitations, it failed to provide evidence of the communication, and the court granted Fortress's motion for summary judgment. Id.

[8] Plaintiff in Fortress Re is the same entity as Defendant in this case.

**2. Whether the Identical Issue was Raised, Necessarily Decided, and Material in Fortress Re**

A New York court recently addressed the same issue that the Court is confronted with here. See Starr Indem. & Liab. Co. v. NEM Re Receivables, LLC, Index No. 652276/2024 (Sup. Ct. N.Y. County. May 18, 2026). Starr involved the same Assignment that granted NEM Re the right to collect reinsurance recoverables after Federated Re's Liquidation.[9] Id. at 1. There, NEM Re submitted reinsurance billings to Starr for asbestos-related loss payments in 2023. Id. The Starr court rejected NEM Re's attempt to distinguish Fortress Re from Starr as a non-risk bearing manager and held that the Fortress Re decision barred NEM Re from relitigating the statute of limitations on the rights conveyed in the 2004 Assignment. Id. at 6.

This Court agrees with the court in Starr that "the specific identity or role of the defendant is legally immaterial to the collateral estoppel analysis regarding the expiration of a contract right." Id. at 5-6. However, this Court is confronted with additional issues related to the question of when the statute of limitations began that could not have been presented in the Fortress Re case. Here, there was a settlement between Catalina and Federated Re that did not exist in either Fortress Re or Starr. NEM Re raises several issues related to the settlement that it argues would either waive or toll the statute of limitations. Opp'n at 10-16.

[9] Defendant NEM Re in the Starr case is the same entity as Defendant in this case.

Because the issue of how the settlement impacted the statute of limitations was not necessarily decided by the Court in Fortress Re, the doctrine of collateral estoppel does not apply, and the Court will consider NEM Re's arguments.

**B. Statute of Limitations for a Breach of Contract Claim**

In New York, the statute of limitations on an action for a breach of contract claim is six years. N.Y.C.P.L.R. § 213(2). The statute of limitations "begins to run when a cause of action accrues," i.e. "when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court." Hahn Automotive Warehouse, Inc., v. American Zurich Ins. Co., 18 N.Y.3d 765, 770 (2012) (quoting Aetna Life & Cas. Co. v. Nelson, 67 N.Y.2d 169, 175 (1986)). In other words, "a claim generally accrues at the time of the breach." Id.

In contracts where "the claim is for payment of a sum of money allegedly owed pursuant to a contract, the cause of action accrues when the [party making the claim] possesses a legal right to demand payment." Id. Reinsurance policies "are express contracts for indemnity against loss." Continental Cas. Co. v. Stronghold Ins. Co., Ltd, 77 F.3d 16, 19 (2d Cir. 1996).

**1. Whether Hahn or Stronghold Applies**

The question here is when the reinsurance billings claim accrued. The Parties respective answers to this question vary by twenty-two years.

Catalina asserts that Hahn, which held that the claim accrues when the party making the claim has the right to demand payment, applies here. Hahn, 18 N.Y.3d at 770. Applying Hahn, Catalina argues the cause of action accrued when the

Liquidator attempted to collect debts owed by Catalina to Federated Re and Catalina denied the claims. To support its position, Catalina cites to a letter from Mendes & Mount to the Liquidator dated October 11, 2001, where they advise that Catalina and other reinsurers "continue to deny the validity of the reinsurance claim submitted…" Dkt. No. 51-9.

NEM Re urges the Court to apply the holding in Stronghold and argues that the statute of limitations did not accrue until Catalina denied payment in 2024. Stronghold, 77 F.3d at 16. In Stronghold the Second Circuit found that Continental, the ceding insurer, did not accrue losses "until a reasonable period of time elapsed after it gave notice of [the losses]…"or "when the reinsurers refused to pay, if earlier, and not before." Id. at 21 (cleaned up). Accordingly, the breach, and therefore the statute of limitations in Stronghold accrued only after the reinsurer rejected the demand for payment. Id.

The Starr court recently considered the same issue. Starr, Index No. 652276/2024, at 1-4. The court found that because "[t]he Second Circuit explicitly conditioned its holding in Stronghold on the unique language of the policies before it," without that unique policy language, "the dispute must be governed by standard, black-letter New York contract law as established in the Hahn precedent." Id. at 4. This Court agrees with the court in Starr and applies the standard from Hahn. Accordingly, the reinsurance billings claim accrued and statute of limitations began after Catalina rejected the claims billed by the Liquidator in 2001.

**2. Whether the 2023 Demand was a New Reinsurance Billing**

NEM Re argues that the 2023 demand was a new reinsurance billing for the ECRA pool claims, which were Assigned to NEM Re as part of the 2004 Assignment, rather than a reassertion of the prior billing that was settled as part of Federated Re's Liquidation. To support its position, NEM Re uses a definition of reinsurance recoverables from a September 2020 article titled *Accounting for Ceded Reinsurance Under LDTI – Introduction*:[10]

> All amounts recoverable from reinsurers for paid and unpaid claims and claim settlement expenses, including estimated amounts receivable for unsettled claims, claims incurred but not reported, or policy benefits.

Opp'n at 2.

NEM Re also cites B.D. Cooke to support its position that the Assignment allowed for both paid and unpaid claims. B.D. Cooke & Partners Ltd. as Assignee of Citizens Cas. Co. of New York (in Liquidation) v. Nationwide Mut. Ins. Co., No. 600655/02, 2003 WL 25780811 (N.Y. Sup. Ct. Oct. 6, 2003), *aff'd as modified*, 16 A.D.3d 208 (1st Dep't 2005). In B.D. Cooke, Citizens was a liquidated reinsurance company. Id. As part of the liquidation, Citizens remained liable for losses that took place prior to the liquidation, including those where no actual loss could be reported yet as long as the actual loss occurred and proof of claim was filed by February 14, 1972. Id. The assignment agreement assigned the plaintiff "all reinsurance agreements running in favor of Citizens or the liquidator effective as from July 1,

[10] *Accounting for Ceded Reinsurance Under LDTI – Introduction,* Society of Actuaries Newsletter, THE FIN. REP., September 2020.

1994, together with all the rights which the liquidator would have had under such agreements, if the Citizens estate did not close." The Court found that the liquidator's assignment was "unambiguous in providing that plaintiff's entitlement to reinsurance recoverables was not limited by the closing of [the] estate." B.D. Cooke & Partners Ltd v. Nationwide Mut. Ins. Co., 16 A.D.3d 208 (1st Dep't 2005).

Unlike B.D. Cooke, the language of the Assignment in this case does not include any specific language that the Recoverables assigned to NEM Re are not limited by the closing of the estate. The Assignment here provides:

> [T]he Recoverables represent claims to reinsurance for paid amounts on claims, or case reserves[11] for claims, which have been allowed in the [Federated Re] liquidation proceeding.

Dkt. No. 51-8. The language in the Assignment limits NEM Re's claims to either reinsurance for paid amounts on claims or case reserves for claims, *which have been allowed in the liquidation proceeding.*

Prior to the Assignment, the Liquidator settled with Catalina by withdrawing the ECRA pool reinsurance billings and recommending an allowance in the amount of $169,919 to Catalina. Dkt. No. 52-1 at ¶ 10. NEM Re argues the Allowance "involved an unauthorized compromise of claims in order to overcome the final objection preventing closure of the [Federated Re] estate." Id. at Response to ¶ 10. Although the Allowance did not include the ECRA pool reinsurance billings after the

---

[11] While there remains some ambiguity about what falls into the definition of Recoverables, this Court need not resolve the issue because of the limiting language "which have been allowed in the liquidation proceeding."

settlement, NEM Re argues the ECRA claims were part of the Assignment. However, the language in the Assignment, distinct from B.D. Cooke, is limited to claims which have been allowed. Dkt. No. 51-8.

Because there is no ambiguity in the Assignment language, the ECRA claims which were not part of the allowance, could not have been assigned to NEM Re. Therefore, as discussed *supra*, the claim accrued when Catalina rejected the Liquidator's billings. Accordingly, Catalina has met its burden of demonstrating the absence of any genuine dispute of material fact as to when the statute of limitations began to run on the ECRA pool claims.

NEM Re, as the nonmoving party, "must come forward with admissible evidence sufficient to raise a genuine issue of fact…" Jaramillo, 536 F.3d at 145. NEM Re provided no admissible evidence to support its position that the expanded definition of recoverables is reflected in the Assignment, such that the ECRA pool claims, which were part of the settlement, were assigned to NEM Re. As such, the statute of limitations began to run after the 2001 denial by Catalina.

**3. NEM RE's Argument That the Settlement Was a Nullity**

NEM Re argues that the settlement was a nullity and as a result the ECRA pool claims were included in the Assignment. Opp'n at 15-16. The Court addresses that argument below.

New York Insurance Law § 7428 allows the superintendent in a liquidation to compromise or compound a debt or claim without obtaining approval of the court if the amount does not exceed twenty-five thousand dollars. N.Y. Ins. Law § 7428(2)(b).

It is undisputed that the Liquidator withdrew reinsurance billings in an amount that exceeded twenty-five thousand dollars from the Allowance and recommended a net amount of 169,919.00 that was ultimately paid. Dkt. No. 51-11; Dkt. No. 51-26. It is further undisputed that the Supreme Court of New York approved the final liquidation of Federated Re in 2004. Dkt. No. 52-1 at ¶ 15.

Whether the Allowance to Catalina was approved in accordance with New York Insurance Law is disputed. NEM Re argues the Allowance was never court approved and therefore the settlement between the Liquidator and Catalina that led to the Allowance is a "nullity." Opp'n at 15-16. Catalina contends that although the best evidence, a document showing court approval, is outstanding, the Allowance was approved. Reply at 11-12. Though there is a dispute of fact, it "does not preclude summary judgment if the dispute is not material to the issue to be determined." Straube v. Florida Union Free School Dist., No. 91 Civ. 1359 (GLG), 801 F.Supp. 1164, 1174 (S.D.N.Y. 1992).

Here, the dispute has no bearing on summary judgment. The operative question is what the Assignment agreement assigned to NEM Re, not whether the ECRA pool claims *should have been* assigned because the Allowance was improper. It is undisputed that the Liquidation, which necessarily included the Allowance, was approved by a court. Dkt. No. 52-1 at ¶ 15. Because, as explained *supra*, the recoverables did not include the ECRA pool claims, the statute of limitations expired long before NEM Re made the demand in 2023. Finally, even if the claims were part

of the Assignment, the statute of limitations expired in 2010, six years after the Assignment under Fortress Re. 173 F.Supp.3d at 9.

**4. NEM RE's Argument That the 2001 Denial Waived the Statute of Limitations Defense**

NEM Re argues that Catalina's actions after the denial of the reinsurance billings in 2001 waived the statute of limitations defense. Opp'n at 10-11. First, NEM Re asserts that Catalina's participation in the settlement agreement with the Liquidator "is fundamentally inconsistent with a final, unequivocal denial and supports the inference that Catalina waived any limitations defense predicated on the earlier correspondence." Id. at 11. Second, NEM Re asserts that under New York General Obligations Law § 17-101, Catalina's "settlement agreements, written confirmation of balances, and payment-related correspondence, with the liquidator," restarted the statute of limitations.

"It is well established that merely engaging in settlement negotiations either before or after the statute of limitations period has run does not estop a [party] from asserting the statute of limitations defense, and cannot be deemed a waiver." Accardi v. Tewell, No. 90 Civ. 5419 (JMC), 1992 WL 122771, at *3 (S.D.N.Y. May 27, 1992) (internal citations omitted). In order for waiver to apply, NEM Re must show that protracted settlement negotiations were utilized "to lull the [party] into inactivity and to induce [the party] to continue negotiations until after the statute of limitations had run." Id. (citing Murphy v. Wegman's Food Mkt., Inc.,140 A.D.2d 973, 974 (4th Dep't 1988). In other words, fraud, deception, or misrepresentation is required. Id.

First, there is no evidence in the record that there was any deceptive conduct by Catalina such that the settlement would waive or bar a statute of limitations defense. Second, Section 17-101 of the General Obligations Law does not waive the statute of limitations defense. To constitute an acknowledgement that would toll the statute of limitations, the writing "must recognize an existing debt and must contain nothing inconsistent with an intention on the part of the debtor to pay it." Lew Morris Demolition Co., Inc. v. Bd. of Educ. of City of New York, 40 N.Y.2d 516, 521 (1976) (internal citations omitted). Here, the October 2001 email did not recognize an existing debt with an unequivocal intention on the part of Catalina to pay it – quite the opposite. The October 2001 letter explicitly stated that Catalina "continue[s] to deny the validity of the reinsurance claim submitted…" Dkt. No. 51-9. As such, there is no genuine dispute of material fact as to whether the statute of limitations defense was waived. The Court finds there was no waiver.

**5. Equitable Principles**

NEM Re makes two arguments that Catalina should be estopped from asserting the statute of limitations defense. First, because the ECRA pool records were destroyed on September 11, 2001. Second, because Catalina "knew the [ECRA] records had been destroyed and nonetheless insisted on their production, inducing delay while reconstruction was ongoing." Opp'n at 25.

**a. The Destruction of Records**

"Under New York law, the doctrines of equitable tolling or equitable estoppel 'may be invoked to defeat a statute of limitations defense when the plaintiff was

induced by fraud, misrepresentations or deception to refrain from filing a timely action.'" Murphy v. Morlitz, No. 15 Civ. 7256 (VSB), 2017 WL 4221472, at *9 (S.D.N.Y. Sept. 21, 2017), *aff'd*, 751 Fed.Appx. 28 (2d Cir. 2018) (citing Abbas v. Dixon, 480 F.3d 636, 642 (2d Cir. 2007)). The actions "must be affirmative and specifically directed at preventing the plaintiff from bringing suit…" Id. (internal citation omitted). If there is no affirmative conduct, the party invoking equitable estoppel is required to show there existed a fiduciary relationship such that the defendant was obligated to inform the plaintiff of the facts necessary to bring the claim. Id. (internal citation omitted). Finally, a plaintiff "must also demonstrate reasonable reliance on the defendant's misrepresentations, and due diligence in bringing a claim when the conduct relied upon as the basis for equitable estoppel ceases to be operational." Id. (internal citations omitted).

NEM Re's equitable estoppel arguments are unavailing. First, the doctrine of equitable estoppel does not apply because the destruction of records in the World Trade Center was not due to any fraud, misrepresentation, or deception on Catalina's part.

Following September 11, 2001, a tolling period was implemented via several executive orders that gave a grace period to litigants who were "affected by the World Trade Cener attacks and whose statute of limitations period expired between September 11, 2001 and November 8, 2001." Scheja v. Sosa, 4 A.D.3d 410, 411 (2nd Dep't 2004). However, the executive orders did not include a tolling provision for claims where the statute of limitations expired after November 8, 2001. Id.; Randolph

v. CIBC World Markets, No. 01 Civ. 11589 (RWS), 219 F.Supp.2d 399, 302 (S.D.N.Y. 2002) (finding a court could extend the statute of limitations period per the September 11, 2001 executive orders for good cause as long as a party made the proper showing prior to November 8, 2001).

Here, the earliest date supported by the record that the six-year statutory period would have *started* was October 11, 2001. Dkt. No. 51-9. As a result, the statute of limitations could not have expired between September 11th and November 8th, 2001. Therefore, though the ECRA documents were destroyed in the World Trade Center, the executive orders that extended statute of limitations for litigants impacted by September 11, 2001 do not apply.

**b. Catalina's Request for Documents That Were Destroyed**

NEM Re cites two cases, General Stencils Inc. v. Chiappa and Simcuski v. Saeli, to support its second argument that Catalina acted deceptively by asking for documents knowing they were destroyed in the World Trade Center and therefore should be estopped from arguing the statute of limitations expired. 18 N.Y.2d 125 (1966); 44 N.Y.2d 422 (1978). In General Stencils the court allowed Plaintiff to argue equitable estoppel because Defendant fraudulently concealed a theft to prevent the plaintiff from timely bringing suit. 18 N.Y.2d at 128-29. The court in Simcuski found that law enforcement officers facing disciplinary action were estopped from asserting a statute of limitations defense because they concealed their wrongdoing from the District Attorney, which prevented the filing of the disciplinary charges within the statutory period. 44 N.Y.2d at 423. Catalina's actions of requesting underlying ECRA

pool documents do not rise to the level of wrongdoing in General Stencils and Simcuski, such that equitable estoppel, which is "an extraordinary remedy that should be invoked sparingly and only under exceptional circumstances," applies here. Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n, No. 17 Civ. 2614 (PAE) (KHP), 632 F.Supp.3d 517, 547 (S.D.N.Y. 2022) (cleaned up).

The Court finds that there is no genuine issue of material fact as to whether the doctrine of equitable estoppel applies to bar Catalina's statute of limitations defense. Accordingly, the Court finds summary judgment on the issue of whether the statute of limitations for NEM RE's claim has expired is appropriate.

## CONCLUSION

For the reasons stated above, summary judgment is **GRANTED** in favor of Plaintiff. Declaratory judgment is entered in favor of Catalina with respect to whether NEM Re's claims are barred by the statute of limitations. The Court **DECLARES** that the statute of limitations bars NEM Re's claims against Catalina in their entirety.

**The Clerk of Court is respectfully requested to close Dkt. No. 51 and to close this case.**

SO ORDERED.

DATED: New York, New York
July 21, 2026

Jennifer E. Willis
JENNIFER E. WILLIS
United States Magistrate Judge